# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-702


**JASON ALDREDGE**

**VERSUS**

**JUSTIN TREVOR ALDREDGE**
**AND BIG HEAD JERRY'S, INC.**


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 27,910
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***


**CHARLES G. FITZGERALD**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***


Court composed of Van H. Kyzar, Jonathan W. Perry, and Charles G. Fitzgerald,
Judges.


**REVERSED; RENDERED; AND**
**REMANDED WITH INSTRUCTIONS.**

**W. Alan Pesnell**
**Alan Pesnell Lawyer, L.L.C.**
**720 Murray Street**
**Alexandria, Louisiana 71301**
**(318) 704-0979**
**Counsel for Plaintiff/Appellant:**
    **Jason Aldredge**

**Gregory B. Upton**
**Stephen A. Lafleur**
**Conner L. Dillon**
**Gold, Weems, Bruser, Sues & Rundell**
**Post Office Box 6118**
**Alexandria, Louisiana 71307-6118**
**(318) 445-6471**
**Counsel for Defendants/Appellees:**
    **Justin Trevor Aldredge**
    **Big Head Jerry's, Inc.**

**FITZGERALD, Judge.**

In the matter before us, Plaintiff filed suit for a declaratory judgment, seeking to be recognized as a fifty-percent owner of a Louisiana closely held corporation. The trial court denied Plaintiff's ownership claim. Plaintiff now seeks review of that judgment.

## FACTS AND PROCEDURAL HISTORY

In 1989, Corwyn Aldredge Sr. ("Mr. Aldredge") incorporated Big Head Jerry's Inc. ("BHJ"). Mr. Aldredge was the original shareholder, owning one hundred percent of the outstanding shares.

Six years later, Mr. Aldredge decided to donate his entire ownership interest (2000 shares) to two of his children: Jason Aldredge ("Jason") and Justin Trevor Aldredge ("Trevor"). Each son would thus receive 1000 shares. To this end, Mr. Aldredge met with Jason in December 1995 and handed him a stock certificate; Jason signed the certificate and handed it back to his father. Mr. Aldredge did the same thing with Trevor.

Mr. Aldredge died in 2015. The ownership dispute began several years later. Then, in 2022, Jason filed a petition for declaratory judgment against Trevor and nominal defendant BHJ. Jason sought a declaration that he was a fifty-percent owner of BHJ. He also sought an order requiring a shareholder meeting, access to company records, and the issuance of a new stock certificate reflecting his ownership interest.

In response, Trevor answered the petition for himself and purported to answer for BHJ. The answer included one affirmative defense: "Jason Aldredge redeemed his 1000 shares of stock in [BHJ] and surrendered his stock certificate, at which time Trevor Aldredge became owner of 100% of the issued and outstanding shares of [BHJ]."

A bench trial was held in August 2024. Then, on September 4, 2024, the trial court issued a final judgment denying Jason's ownership claim with corresponding written reasons. Jason now appeals this judgment, asserting three assignments of error:

> 1. The trial court committed legal error in considering the issues regarding the donative intent of [Mr. Aldredge] which were not raised in the pleadings and which were uncontested.
>
> 2. The trial court committed legal error and manifest error when it determined that the donation of stock to [Jason] was not valid.
>
> 3. The trial court committed an error of law and manifest error in its fact finding when it found that the stock at issue had been redeemed.

## LAW AND ANALYSIS

Questions of law are reviewed de novo. *Domingue v. Bodin*, 08-62 (La.App. 3 Cir. 11/5/08), 996 So.2d 654. Under this review standard, an appellate court simply determines whether the trial court was legally correct.

Findings of fact, on the other hand, are reviewed on appeal using the manifest error-clearly erroneous standard of review. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). To reverse a trial court's determination of fact under this standard, an appellate court must review the record in its entirety and (1) find "that a reasonable factual basis does not exist for the finding," and (2) "further determine that the record establishes that the finding is clearly wrong" or manifestly erroneous. *Id*. at 882. The appellate court must not reweigh the evidence or substitute its own factual findings even if it would have decided the case differently. *Id*. And "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id*. at 883.

Before going further, a summary of the evidence adduced at trial will be useful.

2

**Summary of the Record Evidence**

For all intents and purposes, the record evidence here consists of the corporate records of BHJ and the witness testimony of Jason and Trevor. The corporate records include BHJ's Articles of Incorporation, Bylaws, minutes, stock certificates (issued and cancelled), stock transfer ledger, and annual reports.

As to the witness testimony, Jason testified that BHJ was a land holding company, that his father incorporated BHJ in 1989, that he (Jason) acquired his ownership interest in 1995 through a donation of 1000 shares from his father, and that Trevor received the same number of shares in the same manner. Jason noted that he served as the company's secretary-treasurer since 1995. Trevor, on the other hand, had never been elected as an officer.

Jason then explained that he never maintained the corporate records of BHJ. Those records were maintained by his father. According to Jason, the practice was this: he did what his father wanted him to do. He would sign the business documents his father wanted him to sign, and he would then give them right back to his father who maintained them. Jason was then asked about the details of the donation of stock from his father. Jason recalled that his father met with him, gave him a stock certificate, and he (Jason) signed the front and back of the certificate and then immediately handed it back to his father.

The stock transfer ledger shows the issuance of Certificate No. 2 to Jason for 1000 shares (or one-half of the outstanding shares of BHJ). Similarly, the transfer ledger shows the issuance of Certificate No. 3 to Trevor for the same number of shares. And that same transfer ledger shows the cancellation of Certificate No. 1, which was originally issued to their father. Yet the ledger does not show any transfer of shares after that event.

Jason recalled that during his father's succession proceeding, Trevor never claimed full ownership of BHJ. Jason then pointed out that his father continued to acknowledge him as a corporate officer in all filings with the secretary of state for 2005 (the year of the alleged redemption) and for the ten years that followed. According to Jason, there was never a board meeting in which Trevor was elected as an officer of BHJ.

Next, Jason testified that he never sold or transferred his shares in BHJ. Nor were his shares redeemed by BHJ: there was never an offer to redeem those shares, and there was never a meeting of the board of directors to authorize the redemption of those shares. Indeed, BHJ did not have a bank account. Nor did it have any income or cash. It was a land holding company.

On the reverse side of Jason's stock certificate is the signature of notary public Mary Thomas. Her signature is dated July 15, 2005. According to Jason, Ms. Thomas worked for A & A Western Store Inc. That store was owned by Mr. Aldredge. And for many years, the store was jointly managed by Jason and Trevor. Yet Jason testified that he stopped working at the store in 2005. He testified that he signed the front and reverse side of the certificate in 1995, not 2005. He then stated that Ms. Thomas was not present when he signed the certificate.

Jason was then asked why his father had him sign the back of the stock certificate. Jason explained that he was going through a divorce at that time, and his father was concerned that his wife would assert an ownership interest in those shares. But no such claim was ever made.

Trevor testified next. He confirmed that he also received a donation of 1000 shares from his father in 1995, that Jason was given an equal number of shares in BHJ at that time, that BHJ did not operate a business, that BHJ was a land holding

4

company, that BHJ had no bank accounts or income, that he was not an officer until 2014, that he never maintained the corporate books or any corporate records, and that he attended only one shareholder meeting and one director meeting.

According to Trevor, he owns one hundred percent of the outstanding shares because Jason signed over his shares in 2005. Yet Trevor admitted that he was not present when Jason received his stock certificate or signed it. Trevor has no knowledge of what was done, when it was done, or who was present. He has no knowledge of any redemption price for Jason's shares. Indeed, the only evidence of redemption that he could point to was Certificate No. 2, which was the stock certificate issued in Jason's name.

Trevor also confirmed that Jason's stock was never offered to him and that he was not informed of an offer to redeem those shares. Although Trevor claimed that the transaction at issue was a "redemption," he admitted that the argument was something he and his lawyers came up with after reviewing the corporate records.

Finally, Trevor confirmed that he attended no corporate meetings in which a redemption was authorized (either shareholder or director meetings), that BHJ never had a bank account, that no payment or consideration was given to Jason for the alleged redemption of his shares, and that no change in Jason's ownership status of those shares is reflected in BHJ's transfer ledger.

The corporate records show that a meeting of the shareholders was held on December 29, 1995. The minutes from that meeting reflect that Jason and Trevor were both present and that Jason and Trevor were elected as the only two directors of the corporation. The meeting of the board of directors was then held that same day. The minutes from that meeting reflect that Mr. Aldredge was elected president,

and Jason was elected secretary-treasurer. This was the only meeting attended by Trevor.

**First and Second Assignments of Error**

In its written reasons for judgment, the trial court frames the issues this way: "Did a valid donation of stock in BHJ occur from [Mr. Aldredge] to Jason Aldredge?" And "[i]f a valid donation did occur, did Jason Aldredge later redeem his shares of stock in BHJ?"

Next, the trial court's reasons provide a lengthy analysis of Mr. Aldredge's donation of BHJ shares to Jason. The trial court then concludes that the donation from father to son was not valid. Yet none of this is in the final judgment. Instead, the final judgment states that "judgment is rendered in favor of Justin Trevor Aldredge and Big Head Jerry's, Inc. ("BHJ"), and against Jason Aldredge, denying his claim that he is the owner of fifty percent of the outstanding shares of BHJ, at plaintiff's cost."

Nevertheless, Jason's first and second assignments of error contend that the trial court legally erred in considering the validity of the initial donation and in determining it was not valid. Although we agree that the trial court's focus was misplaced, the matter is of no moment. Why? Because we review judgments, not reasons for judgment. *Succession of Hackney*, 97-859 (La.App. 3 Cir. 2/4/98), 707 So.2d 1302.

That said, we would be remiss if we did not explain why the trial court's focus on the initial donation was misplaced. First, that issue was not pleaded as an affirmative defense nor was it otherwise properly before the trial court.

Second, Trevor admitted in his answer that "[o]n December 19, 1995, [Mr. Aldredge] transferred 1000 of his shares in [BHJ] to Trevor Aldredge and 1000

6

shares to Jason Aldredge. After the transfer Trevor Aldredge owned 50% and Jason Aldredge owned 50% of the stock in [BHJ]."

Third, Mr. Aldredge's donation of 1000 shares to Jason mirrored his donation of 1000 shares to Trevor. The donations were effectuated in the exact same manner. So if the donation to Jason was invalid, the donation to Trevor would also be invalid. This is why Trevor was quick to admit to the validity of both donations.

Fourth and finally, the donation of 1000 shares from Mr. Aldredge to Jason complied with the legal requirements in effect in 1995: the donation was thus valid.

But again, we review judgments, not written reasons for judgment. The soundness of the trial court's written reasons for judgment is not an issue on appeal. Hence, Jason's first and second assignments of error are of no moment.

**Third Assignment of Error**

In his third assignment, Jason asserts that the trial court manifestly erred in finding that the shares at issue had been redeemed.[1]

At trial, Jason had the initial burden of proving his ownership interest in BHJ. He did this by introducing into evidence stock Certificate No. 2. "[A] stock certificate is prima facie evidence of corporate ownership[.]" *Fireplace Shop, Inc. v. Fireplace Shop of Lafayette, Inc.*, 400 So.2d 702, 703 (La.1981). Additionally, Trevor admitted at trial that Mr. Aldredge gave Jason 1000 shares in December 1995 and that Jason was the legal owner of those shares at that time. At this point, the burden shifted to Trevor to prove his affirmative defense: redemption.

_____

[1] Unlike the previous issue, Trevor's affirmative defense of redemption was properly before the trial court. Thus, the trial court's written reasons on that issue will assist us in determining whether there was error.

To this end, the trial court summarized Trevor's affirmative defense in its reasons for judgment as follows:

> With respect to the issue of redemption, Defendants[, Trevor and BHJ,] argue that Jason's testimony about signing the back of the stock certificate and delivering same to his father . . . establishes a prima facie case for redemption. They further argue that the transaction was a redemption rather that [sic] a transfer because the evidence indicates that the first right of refusal limitation upon third party transfers (established in Article 3.3 of the BHJ's Articles of Incorporation) was not complied with. Defendants also argue that [Mr. Aldredge] did not receive the shares in his personal capacity because during the course of his Succession it was determined that he did not own any interest in BHJ. Thus, Defendant's [sic] conclude, [Mr. Aldredge] can only have accepted the redemption of Jason's shares in his capacity as President of BHJ.

Ultimately, the trial court agreed with Trevor, finding that "Jason Aldredge redeemed his shares. Accordingly, his Petition for Declaratory Judgment is denied[.]" In our view, the trial court manifestly erred in making this finding and in denying Jason's claim based on that finding.

To begin, Chapter 8 of the Louisiana Commercial Laws governs the transfer of corporate securities. Under that chapter, indorsement and delivery of a stock certificate is sufficient to transfer the underlying shares. La.R.S. 10:8-304. "'Indorsement' means a signature that alone or accompanied by other words is made on a security certificate in registered form or on a separate document for the purpose of *assigning, transferring or redeeming* the security or *granting a power to assign, transfer, or redeem it*." La.R.S. 10:8-102(a)(11) (emphasis added). "An indorsement may be in blank or special." La.R.S. 10:8-304(a).

Here, Jason's father handed him Certificate No. 2 and asked him to sign the front and back. Jason complied and then handed the certificate back to his father. Jason's signature on the reverse side of the certificate is an example of an in blank indorsement. And delivery of the stock certificate was accomplished when Jason

8

handed it back to his father.

But in this instance, are these two things—in blank indorsement and delivery—enough to establish a prima facie case of redemption? The answer is no. In other words, the fact that Jason signed the back of the stock certificate and handed it back to his father could be evidence of a sale by Jason to his father; it could be evidence of a donation inter vivos from Jason to his father; it could signify a pledge (as security for a personal loan); it could also be evidence of a donation from Jason to BHJ (but this assumes that Jason's father accepted delivery in his capacity as president of BHJ); it could be a pledge to BHJ; or it could be none of these things— Jason could have simply granted his father the power to transfer the shares based on the happening of a future uncertain event, such as his former wife claiming an ownership interest in those shares.

But even still, Trevor points to the transfer restrictions in the Articles of Incorporation as dispositive evidence of share redemption by BHJ. According to Trevor, this "could not have been a sale, because of the restrictions on the sale of stock contained in the Articles of Incorporation and Bylaws of BHJ[] prohibited such an act. The Articles provide that shares of stock may not be 'transferred' without first offering the shares to the other stockholders." (Footnote omitted).

Trevor then suggests that a redemption of stock is not a "transfer." As he puts it: "[T]here is a distinct difference between a transfer of stock, such as a sale, and a redemption." We disagree for two reasons. First, the essence of a redemption is the transfer of shares from a shareholder back to the corporation. This is discussed below in greater detail.

And second, Trevor's argument is misleading and incomplete. The share transfer restriction at issue is found in the Articles of Incorporation, and the full text

9

of that restriction is reproduced as follows:

> [S]hares of stock in this corporation shall not, subsequent to the initial issuance thereof, be *transferred in any manner* from the owner thereof without first offering said shares to all other stockholders of the corporation in proportion to the percentage of the outstanding stock of the corporation owned by each of the other stockholders for purchase by the latter at current book value or for a sum equal to the highest bona fide offer made by some third party for the purchase of the shares, whichever price is higher; provided, however, that this provision shall not apply to bona fide employee stock-option plans which may be adopted by the Board of Directors. The non-selling shareholders shall be allowed a period of fifteen (15) days to determine whether to purchase any stock tendered under this provision, during which period no sale to a third party may be consummated.

(Emphasis added).

The above transfer restriction does not identify a particular type of transfer. Instead, it is written broadly—shares shall not "be transferred in any manner"—to ensure absolute control over entry into the corporation. In short, the transfer restriction is not limited to just sales; it covers all manner of transfers, including redemption of shares, donations, and even pledges.

Trevor also contends that Mr. Aldredge accepted delivery of Certificate No. 2 in his capacity as president of BHJ, as opposed to receiving delivery in his personal capacity. In support, Trevor attempts to point to a judgment rendered in his father's succession proceeding in 2019. But that judgment was not filed into evidence in the matter before us, meaning that it is not part of the record on appeal.

So what is redemption? At all relevant times in this case,[2] former La.R.S. 12:55 (1989) governed the power of a corporation to purchase or redeem its shares.[3]

---

[2] It is of no consequence that Jason's signature on the reverse side of Certificate No. 2 is dated July 15, 2005, despite his testimony that he signed both sides of the certificate on December 29, 1995. The same law was in effect on both dates. And our ultimate disposition does not change depending on which date is used.

[3] Louisiana Revised Statutes 12:55 (1989) was repealed by 2014 La. Acts No. 328, § 5. The full text of former La.R.S. 12:55 (1989) is reproduced as follows:

Professors Morris and Holmes addressed the former statute in their treatise on business organizations, stating as follows:

> The statutory language [of La.R.S. 12:55 (1989)] reflects the generally accepted distinction between *repurchase*, which is often used as the broad generic description for any acquisition of its own shares, and *redemption*, which more narrowly applies to the acquisition of shares pursuant to some right or obligation created at the time of issuance of the shares.

Glenn G. Morris & Wendell H. Holmes, 7 La. Civ. L. Treatise, Business Organizations § 27:02 at 658 (1999).

Importantly, the disputed shares here were not issued with redemption rights; they are not redeemable shares. Thus, BHJ could not have repurchased the shares pursuant to some purchase right or option created at the time of issuance of those shares. This means that redemption would have required approval from the board

---

A. A corporation shall not purchase or redeem its shares when it is insolvent, or when such purchase or redemption would render it insolvent, or at a price, in the case of shares subject to redemption, exceeding the redemption price thereof, or when its net assets are less than, or such purchase or redemption would reduce its net assets below, the aggregate amount payable on liquidation upon any issued shares, which have a preferential right to participate in the assets in event of liquidation, remaining after the purchase or redemption and cancellation of any shares in connection therewith. Subject to the provisions of this subsection, a corporation may purchase its own shares, or redeem its shares subject to redemption, as provided in the following subsections of this section.

B. Subject to the provisions of R.S. 12:62(B), a corporation may purchase its own shares, or redeem its shares subject to redemption, out of surplus or, as permitted by R.S. 12:55(C) out of stated capital.

C. A corporation may purchase or may redeem its shares subject to redemption out of stated capital only to the extent that stated capital is not thereby reduced below the aggregate allocated value of the issued shares remaining after the purchase or redemption and cancellation of any shares in connection therewith.

D. Shares which are cancelled are thereby restored to the status of authorized and unissued shares, unless the articles provide otherwise; however, shares purchased out of stated capital for the purpose of paying dissenting shareholders entitled to payment for their shares under the provisions of this Chapter shall be cancelled.

of directors. And it is undisputed that this never happened.

There are other statutory restrictions on the repurchase or redemption of shares. For instance, subject to the requirement of earned-surplus reserves in former La.R.S. 12:62(B) (1984), the corporation must purchase or redeem its own shares out of surplus. La.R.S. 12:55(B) (1989). Yet here, it is undisputed that BHJ had no cash, income, or bank accounts, meaning there were no legally available funds for the redemption or repurchase of Jason's shares. And "the legality of share reacquisitions depends largely upon the presence of legally available funds in the capital accounts of the corporation." Morris & Holmes, 7 La. Civ. L. Treatise, Business Organizations § 27:03 at 659 (1999).

Finally, other than Jason's signature on the back of Certificate No. 2, nothing in the corporate records evidences the alleged redemption or repurchase of shares by BHJ. This is in stark contrast with the donation of shares from Mr. Aldredge to his sons. That transfer was immediately reflected in the company's transfer ledger; Mr. Aldredge's stock certificate was promptly cancelled; and new certificates were issued to his sons. So why are the company records silent as to the alleged redemption? It is because Jason's shares were never redeemed by BHJ. The record evidence does not support any other conclusion.

In the end, Jason satisfied his burden of proving ownership of one-half of the issued and outstanding shares of BHJ. The burden then shifted to Trevor to prove his affirmative defense of redemption. Ultimately, the trial court manifestly erred in finding that the disputed shares had been redeemed by BHJ.

**DISPOSITION**

For the above reasons, we reverse the judgment of the trial court, and we render judgment in favor of Jason Aldredge and against Justin Trevor Aldredge and

12

Big Head Jerry's Inc., declaring Jason Aldredge the legal owner of fifty percent of the issued and outstanding shares of Big Head Jerry's Inc. We also remand the case to the trial court for a determination of the incidental relief sought in Jason Aldredge's petition for declaratory judgment. And finally, the costs of this appeal are assessed to Justin Trevor Aldredge.

**REVERSED; RENDERED; AND REMANDED WITH INSTRUCTIONS.**